## Commonwealth *vs.* Francis McCourt.

Hampden. December 5, 2002. - January 17, 2003.

Present: Marshall, C.J., Greaney, Spina, Sosman, & Cordy, JJ.

*Rape. Statute,* Construction.

This court concluded that proof of the offense of aggravated rape did not require a causal or facilitating connection between the aggravating act or acts and the rape, and that the language of G. L. c. 265, § 22 (*a*), was sufficiently broad to encompass a rape that preceded a brutal beating that inflicted serious bodily injury on the victim, so long as the rape and the beating constituted one continuous episode and course of conduct. [492-496]

At the trial of an indictment charging aggravated rape under G. L. c. 265, § 22 (*a*), there was ample evidence for a jury to conclude beyond a reasonable doubt that the physical assault and the sexual assault on the victim constituted one calculated and continuous episode; consequently, this court affirmed the defendant's conviction of aggravated rape. [496-497]

Indictments found and returned in the Superior Court Department on February 26, 1997.

The cases were tried before *Bertha D. Josephson*, J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Bethany C. Lowe*, Assistant District Attorney, for the Commonwealth.

*Murray A. Kohn*, Committee for Public Counsel Services, for the defendant.

*Barbara F. Berenson & Wendy J. Murphy*, for National Crime Victim Law Institute & another, amici curiae, submitted a brief.

Greaney, J. The defendant was tried before a jury in the Superior Court on indictments charging him[1] with aggravated rape, attempted murder, assault and battery by means of a dangerous weapon (a shod foot), and indecent assault and

---

[1]The indictments identified the defendant as "Francis McCourt, also known as Kevin Michael Barscz, also known as Kevin McCourt."

battery. The charges stemmed from a rape and beating that occurred in Chicopee in the early morning hours of February 1, 1997. The jury found the defendant guilty on all charges. The Appeals Court vacated the defendant's conviction of aggravated rape, concluding that the statute punishing aggravated rape, G. L. c. 265, § 22 (*a*), requires that the aggravating factors that transform rape into aggravated rape must play a facilitating role in the rape, and that the Commonwealth's evidence showed that the defendant had savagely beaten the victim after the rape occurred, but not before.[2] See *Commonwealth* v. *McCourt*, 54 Mass. App. Ct. 673, 681 (2002). We allowed the Commonwealth's application for further appellate review solely to decide whether proof of the offense of aggravated rape requires a causal or facilitating connection between the aggravating act or acts and the rape.[3] We conclude that such proof is not required. Consequently, we affirm the defendant's conviction of aggravated rape.

We set forth the facts that could have been found by the jury based on the Commonwealth's evidence, in slightly more detail than did the Appeals Court. A few minutes after midnight on February 1, 1997, the victim drove to an American Legion Post in Chicopee (post), to see a man, the post's bartender (whose first name was Steve), whom she had dated during the preceding month. Outside, snow had begun to fall. At about 1:30 A.M., the defendant, whom Steve knew, but whom the victim had never met, entered the post and sat down at the bar near to where the victim was seated. Steve, the defendant, and the victim conversed briefly, and the defendant showed the victim a game involving finding an owl on a five dollar bill. The victim was polite to the defendant, but found his behavior "odd."

---

[2]The Appeals Court concluded that the Commonwealth's evidence was sufficient to support a conviction of rape under G. L. c. 265, § 22 (*b*), and, because the jury necessarily had found that the defendant had raped the victim, remanded the case to the Superior Court for resentencing on the offense of rape. See *Commonwealth* v. *McCourt*, 54 Mass. App. Ct. 673, 681-682 (2002). The defendant's remaining judgments of conviction, which play no part in this appeal, were affirmed. See *id.* at 682.

[3]At the same time, we denied the defendant's application for further appellate review, principally because we agreed with the Appeals Court's decision with respect to the issues raised by his appellate counsel and by his pro se appellate brief. See *Commonwealth* v. *McCourt, supra* at 673-674 n.1.

After about twenty minutes, the defendant got up and left the post. The victim remained with Steve while he closed up. At about 2:15 A.M., Steve and the victim said goodbye in the post's parking lot and the victim got in her automobile to drive home. By that time it was snowing hard, and a substantial amount of snow had accumulated.

The victim, who lived in a different part of Chicopee from where the post was located, soon became confused on the unfamiliar streets and took a wrong turn. She eventually found herself at the end of a cul-de-sac in a residential neighborhood, her car stuck in the snow at the end of a driveway. It was now snowing heavily. Stepping out of her automobile intending to push it out of the snow, the victim saw the defendant walking around the back of her vehicle. The defendant chuckled and said, "What's the matter, you're stuck." Feeling slightly afraid, the victim asked the defendant whether he lived there, and the defendant responded affirmatively.[4] The victim then asked the defendant to help free her vehicle. She testified that she "just wanted to get the hell out of there and leave." The defendant approached the passenger's side and began to push, although, in the victim's view, without a great deal of effort. The victim moved to open the driver's side door, telling the defendant that she was going to shift into a forward gear (but really intending to get in for her safety), when the defendant ran over, grabbed her arm, and instructed her to unlock the vehicle's back door.

Frightened, the victim stood still. The defendant moved his hand up to her shoulder, blocked the victim's entrance to the vehicle, and repeated his order to unlock the back door. This time, the victim obeyed. Still grasping the victim, the defendant opened the back door and pushed her into the rear seat. Her daughter's car seat was in the way, and the defendant yelled at the victim to remove it. The victim unbuckled the car seat, but did not remove it. The defendant became angry and threw the car seat into the front seat. He then grabbed the victim, hit her chest, forced her into the back seat, squeezed her breasts hard,

---

[4] This was untrue. The defendant told police, and testified at trial, that he had waited outside the American Legion post until the victim emerged, followed her automobile until it became stuck in the snow, and then had consensual sexual intercourse with the victim.

and tried to kiss her. The victim was crying and begged him, "Why are you doing this? What are you doing?"

Certain that the defendant was going to rape her, and uncertain whether he had a weapon, the victim felt frightened for her life. She testified that, aware that he was becoming angry, she "just turned to jelly, and . . . let him do what he wanted to do." As the victim lay crying, the defendant first inserted snow into her vagina, and then had sexual intercourse with her. Afterward, the defendant looked at the victim with an "evil look that just came over his face" and said, "You don't expect me to let you leave now, do you, not after I just raped you? You have all the evidence on me. . . . You can get me arrested in a heartbeat. . . . I can't let you go."

At that point, the defendant put his hands together in a fist and hit her on the back of her head, knocking her to the side of the road. When the victim asked why he had hit her, the defendant became extremely angry, made a "growling noise," and charged at the victim's throat. He grabbed the victim's windpipe, completely cutting off her air. While holding her throat, the defendant told the victim, "Since I just got out of jail, I can't expect you to live. I'm not going back, so I'm not going to let you live." The victim struggled and managed to get the defendant's hands off her throat, but he soon regained his grip and squeezed again. He immobilized the victim on her back on the ground by holding her throat and grabbing her hair, all the while making growling noises. The victim repeatedly begged the defendant to let her go, so that she could see her daughter "one more time." Repeatedly, the defendant responded that he could not let her go home. He finally released her and the victim was able to roll over and stand up.

Playing for time, she walked slowly down the street. She again said to the defendant, "Please let me go home." When the victim told the defendant that her daughter was in Springfield, he became enraged, charged at her, and accused her of lying, because the victim earlier had told him that she lived in Chicopee.[5] He grabbed her by the hair and throat and, twisting her neck, threw her to the ground. The victim testified that

---

[5]The victim testified that her daughter at the time was with her father, who lived in Springfield.

she "was screaming for [her] life." Each time the victim attempted to stand up, the defendant knocked her to the ground. The victim eventually remained on her knees and looked up. At this point, the defendant "twirled his boot" and kicked her in the face four times.[6] As the victim begged for her life, the defendant told her, "Quit crying."

Still on her knees, the victim held snow to her face because she felt hot. When she pulled the snow away, she saw that her hand was full of blood. The defendant found her pack of cigarettes lying in the snow and tossed it to her. As she put a cigarette to her lips, the defendant again kicked her in the face. The victim asked, "What the hell did you do that for? . . . I thought you were going to let me have a cigarette," to which the defendant replied, "You don't deserve anything." He then tossed the victim to the ground on her stomach and began pounding on her back "like [she] was a piece of dirt."

In an effort to pacify the defendant, the victim looked him right in the eye and spoke softly, saying, "Somebody must have hurt you in your past [and o]bviously, you don't know me. Why are you taking it out on me?" The defendant finally calmed down and began crying. He helped her free her automobile, and the victim quickly got in. Immediately, the defendant moved to the driver's side, stuck his arm through the partially opened front window, and pressed an electronic button to open the window fully. He then leaned through the window and asked, "Why are you leaving?" Fearful that he might hurt her again, the victim replied that she had to go to work and gave the defendant her telephone number. To appease his concerns about her bloody clothing or that she would notify the police, the victim told the defendant that she would "go home and throw [her sweater] in the wash, and my mother will be sleeping. No one will know." At this point, the defendant said he was sorry, that the victim was "a nice person," and that he "shouldn't have done it." At the moment the defendant stepped away from the car, the victim drove away. She arrived home ten minutes

---

[6]At trial, the Commonwealth introduced in evidence a pair of work boots, which the defendant was wearing at the time of his arrest. The defendant testified that he had worn the same pair of boots during the incident with the victim in the early morning hours that same day.

later, at approximately 5 A.M., and immediately told her mother
what had happened. Her mother telephoned 911, and the victim
was taken by ambulance to the emergency room of a hospital.

The victim's injuries included swelling of her lips and face;
an abrasion or laceration on her lower lip; a two-inch laceration
on her chin; bruising on the upper part of her throat and neck; a
four-inch abrasion on the right side of her neck; bruising on her
upper front chest and neck and across the top of her back; abra-
sions on her left knee and the back of her calf; and swelling of
her left wrist; swelling and redness of her external genitalia;
mild swelling of her anus; and a possible tear in the vaginal
wall. Her clothing was wet and stained with blood. Blood
covered her face and there were flecks of dried blood on her in-
ner thighs.

The defendant was arrested later that same day. At trial, at
the close of the Commonwealth's evidence and again after the
close of all the evidence, the defendant moved for a required
finding of not guilty on the indictment charging him with ag-
gravated rape, asserting that any physical violence that oc-
curred, "occurred after, separate and distinct from the issue of
the sexual intercourse," and, as a consequence, the Com-
monwealth had failed to show an aggravating factor in the rape
itself, as required by G. L. c. 265, § 22 (*a*). The trial judge
denied the motions, stating that "a rational trier of the fact
could conclude . . . that in the entire transaction, which
included sexual assault as well as a physical assault at the same
location and within a relatively discrete period of time without
any intervening additional events, that all elements of [ag-
gravated rape] had been proven beyond any reasonable doubt."

The judge instructed the jury, along the lines of G. L. c. 265,
§ 22 (*a*), that, in order to convict the defendant of aggravated
rape, they must find beyond a reasonable doubt that the rape
either was "committed along with or resulted in serious bodily
injury" to the victim, or that it was "committed during the
commission of the crime of assault and battery by means of a
dangerous weapon." With respect to the first basis for convic-
tion, the judge advised the jury that the acts that result in seri-
ous bodily injury need not occur at the precise moment of
vaginal penetration, but that they must occur as part of "one

continuous episode and course of conduct during the course of the rape." With respect to the second basis, the judge instructed that the rape and the assault and battery by means of a dangerous weapon need not occur at the same time, but that the offenses must constitute "one continuous episode and course of conduct." At the defendant's request, the judge further instructed the jury that they could find the defendant guilty of rape, and of assault and battery by means of a dangerous weapon, without finding him guilty of aggravated rape, if they determined the offenses constituted "two separate events that [were] not part of a continuous episode." The jury convicted the defendant of aggravated rape on the basis of both theories on which the judge had instructed.

1. The defendant concedes, for purposes of this appeal, that he committed the offenses of rape and of assault and battery by means of a dangerous weapon.[7] He argues, nevertheless, that his conduct did not constitute aggravated rape because the acts constituting the assault and battery (and which resulted in the victim's injuries) did not begin until after the rape. The defendant asserts that "the essence of the crime of rape is the use of force or threat of bodily injury in order to overcome the victim's will to resist and to compel the victim to submit to nonconsensual sexual intercourse." Thus, the defendant reasons, the elements that transform the crime of rape into the crime of aggravated rape under G. L. c. 265, § 22 (a), must be used to facilitate the rape or to overcome the victim's will to resist being raped. This analysis is incorrect.

General Laws c. 265, § 22 (a), set forth below,[8] on its face, does not require that the aggravating factor or factors be used to

---

[7] He also does not argue that the victim did not sustain "serious bodily injury," as that term is used in the context of G. L. c. 265, § 22 (a).

[8] General Laws c. 265, § 22 (a), reads:

"Whoever has sexual intercourse or unnatural sexual intercourse with a person, and compels such person to submit by force and against his will, or compels such person to submit by threat of bodily injury and if either such sexual intercourse or unnatural sexual intercourse results in or is committed with acts resulting in serious bodily injury, or is committed by a joint enterprise, or is committed during the commission or attempted commission of an offense defined in section fifteen A [assault and battery by means of a dangerous weapon], fifteen B [as-

facilitate the unlawful sexual intercourse. When a rape victim sustains serious bodily injury, the pertinent statutory language requires only that the intercourse have been "committed with" the acts that resulted in the victim's injuries.

While the language "committed with," of course, implies some logical nexus between time and place, the words do not specifically require that the physical force precede the rape or that the injuries be inflicted to overcome a victim's will to resist. If this were true, a person who savagely beat his victim following a sexual attack, as here, would be punished less severely than one who inflicted the beating before penetration, even though both rape victims sustained identical injuries.

There is no indication that the Legislature intended such an anomalous result. In 1974, the Legislature revised G. L. c. 265, § 22, defining the crime of rape as "sexual intercourse or unnatural sexual intercourse with a person" who is compelled to submit either "by force and against his will" or "by threat of bodily injury." St. 1974, c. 474, § 1. In 1980, the Legislature again revised § 22, leaving unchanged the description of rape, but setting forth, in § 22 (*a*), a heightened penalty when specified aggravating factors are present. See St. 1980, c. 459, § 6. See also *Aldoupolis* v. *Commonwealth*, 386 Mass. 260, 267 n.10, cert. denied, 459 U.S. 864 (1982). The Legislature's choice of the flexible terms "committed with" and "committed during," rather than terms indicating a restrictive causal relationship, such as "accomplished by" or "facilitated by," demonstrates its intent to avoid a limiting temporal distinction.

This commonsense interpretation of G. L. c. 265, § 22 (*a*), is consistent with the manner in which we have interpreted other

sault by means of a dangerous weapon], seventeen [armed robbery], nineteen [unarmed robbery] or twenty-six [kidnapping] of this chapter, section fourteen [armed burglary], fifteen [unarmed burglary], sixteen [breaking and entering in the night time with intent to commit a felony], seventeen [breaking and entering in the daytime or entering without breaking in the night time] or eighteen [entering dwelling house in the night time] of chapter two hundred and sixty-six or section ten [firearms and dangerous weapon] of chapter two hundred and sixty-nine shall be punished by imprisonment in the state prison for life or for any term of years."

statutes punishing violent crimes. For example, under G. L.
c. 265, § 19, a person may be convicted of robbery, even though
the use of force occurred after the taking of the property. See
*Commonwealth* v. *Sheppard*, 404 Mass. 774, 778 (1989); *Commonwealth* v. *Jones*, 362 Mass. 83, 89-90 (1972). See also
Model Penal Code § 222.1 and comment 2 (Official Draft 1980)
(force or threat of force may occur "in the course of committing a theft," even in the period of flight after the commission).
Likewise, the felony-murder rule applies to killings that occur
"in the commission of" the underlying felony, regardless
whether the killing occurs before or after that felony. G. L.
c. 265, § 1. See *Commonwealth* v. *Ortiz*, 408 Mass. 463, 466
(1990) ("It would be enough if the homicide[] occurred as part
of the defendant's effort to escape responsibility for the underlying felony"). The two offenses must be linked, but the timing is
not critical, because "[a]s a matter of logic and policy, those
who inflict bodily injury on their victims before they complete
their crimes are not treated more leniently than those who do
not." *Commonwealth* v. *Christian*, 430 Mass. 552, 557 (2000).
See also G. L. c. 265, § 18B (imposing heightened penalties for
felonies committed while in possession of firearm [regardless
whether firearm was used to commit felony]).

Our interpretation also is consistent with the approach taken
by the Model Penal Code, the provisions of which have guided
our interpretation of our rape statutes in the past. See *Commonwealth* v. *Gallant*, 373 Mass. 577, 588-589 (1977). The
Model Penal Code divides the offense of rape into three felony
levels, with the most serious category (corresponding to the offense of aggravated rape) reserved for those instances in which
the victim is "not a voluntary social companion" of the
defendant and "had not previously permitted him sexual liberties," or when the actor inflicts serious bodily injury on anyone
"in the course thereof." Model Penal Code, *supra* at § 213.1.[9]

We repeatedly have stated that "[t]he essence of the crime of

---

[9]Three decisions from other State appellate courts, cited by the Commonwealth, merit mention. Although interpreting slightly different language of
their own aggravated rape statutes, each decision focuses on the court's
conclusion that bodily injury is sufficiently connected to a sexual assault
whenever a series of incidents forms one continuous "transaction," regardless
of whether a beating precedes or follows the sexual abuse. See *State* v. *Carter*,

rape, whether aggravated or unaggravated, is sexual intercourse with another compelled by force and against the victim's will or compelled by threat of bodily injury." *Commonwealth* v. *Guisti,* 434 Mass. 245, 248 (2001), quoting *Commonwealth* v. *Sherry,* 386 Mass. 682, 687 (1982). See *Commonwealth* v. *Lopez,* 433 Mass. 722, 726-729 (2001); *Commonwealth* v. *Caracciola,* 409 Mass. 648, 651 (1991); *Commonwealth* v. *Helfant,* 398 Mass. 214, 220 (1986). It does not follow, however, as the defendant contends, that the conduct that raises the felony of rape to one of aggravated rape must also be used to overcome the victim's will to resist the rape. As stated in the opinion of the Appeals Court, rape is "a crime involving not simply sex but 'violence and domination "calculated to humiliate, injure and degrade." ' " *Commonwealth* v. *McCourt, supra* at 681, quoting *People* v. *McKenna,* 196 Colo. 367, 372 (1978).[10] The Legislature's clear purpose in creating the offense of aggravated rape was to protect victims of violent sex offenders, by punishing more severely perpetrators (i) who inflict serious bodily injury on a victim, in addition to the bodily harm from the act of rape itself; (ii) who commit rape by joint venture; or (iii) who commit other felonies against the victim in addition to the rape.[11] The critical point is not whether the aggravating acts served to compel a victim's submission, but whether the rape victim sustained serious bodily injuries, or was subjected to other felonious conduct, during the same criminal episode. The

602 N.W.2d 818, 822 (Iowa 1999) (interpreting statutory language "in the course of"); *State* v. *Gray,* 895 S.W.2d 241, 244 (Mo. Ct. App. 1995) (same); *State* v. *Blackstock,* 314 N.C. 232, 238, 241-242 (1985) (interpreting statutory language requiring rape "and" infliction of serious personal injury; basing decision on Legislature's exclusion of prior language requiring that injury be inflicted to overcome victim's resistance).

[10]Although rape is a crime of violence, the force used to accomplish the rape need not be physical force. See *Commonwealth* v. *Caracciola,* 409 Mass. 648, 652 (1991).

[11]We reject the defendant's contention that the history of St. 1980, c. 459, § 6 (specifically, the Legislature's exclusion of language contained in the original Senate bill, 1980 Senate Doc. No. 1006, that would have required the rape to occur "in conjunction with" the aggravating acts, and its rejection of a proposed amendment, 1980 House Doc. No. 6776, § 13, that would have included as aggravating offenses the crimes of assault with intent to murder, G. L. c. 265, § 15, and assault with intent to rob or murder while armed with a dangerous weapon, G. L. c. 265, § 18), reflects a legislative intent different from that described above.

Legislature, by enacting G. L. c. 265, § 22 (*a*), intended that rapists who inflict serious bodily injury or commit other crimes against their victims, will be dealt with severely. It is neither appropriate nor consistent with the Legislature's purpose to draw an artificial bright line between the ending of the sexual offense and aggravating conduct that occurs immediately thereafter. We conclude that the language of G. L. c. 265, § 22 (*a*), is sufficiently broad to encompass a rape that precedes a brutal beating that inflicts serious bodily injury on the victim, so long as the rape and the beating "constituted one continuous episode and course of conduct." See *Commonwealth* v. *Moreschi*, 38 Mass. App. Ct. 562, 569-570 (1995).[12]

It remains for the jury to consider each case on its own facts and to determine whether there is an adequate nexus between the unlawful sexual intercourse and the serious bodily injury or the acts constituting one of the enumerated offenses. This is a task jurors commonly are called to make. The jury are entitled to consider the entire sequence of events in making their determination whether the aggravating acts occurred in the course of the rape, or whether, because of intervening time or events, the rape and the aggravating acts cannot be viewed as one continuous course of criminal conduct directed at the victim, and so may find the defendant guilty of two separate offenses, but not of aggravated rape.

---

[12]The defendant relies on *Commonwealth* v. *Kickery*, 31 Mass. App. Ct. 720 (1991), in which the Appeals Court reversed the defendant's conviction of aggravated rape on the ground that the rape did not occur "during the commission" of the kidnapping, as required by G. L. c. 265, § 22 (*a*). See *id.* at 724. The Appeals Court reasoned that, because the evidence showed that the victim had willingly accompanied the defendant to the spot where she was raped, the defendant's subsequent acts of tying her to a tree and leaving her there, while sufficient to constitute kidnapping, took place after the rape and, thus, were "separate and distinct" from the rape. See *id.* at 723-724. The *Kickery* decision is inconsistent with what we hold today. We recently referred to the *Kickery* decision in *Commonwealth* v. *Maynard*, 436 Mass. 558, 567-568 (2002), in response to an argument made by the defendant that physical restraint, in order to facilitate separate assaults on a victim, does not constitute kidnapping. See *Commonwealth* v. *Maynard*, *supra* (distinguishing *Kickery* on its facts). The *Maynard* decision did not raise any issue with respect to the requirements of G. L. c. 265, § 22 (*a*), and our discussion of the *Kickery* decision was not meant to address the issue decided today. We conclude that *Commonwealth* v. *Kickery*, *supra*, cannot stand under our interpretation set forth above and, therefore, we overrule it.

Applying our interpretation of G. L. c. 265, § 22 (*a*), to the evidence, we conclude that there was ample proof for a jury to conclude beyond a reasonable doubt that the physical assault and the sexual assault constituted one calculated and continuous episode.[13] The evidence shows that the defendant followed the victim in the snowstorm; approached her when she became stranded; forced her into the backseat of her automobile; raped her; informed her that he could not let her live; began striking her in the head and back and, finally, kicked her with his boot as she lay on the ground. The facts also indicate that the defendant inflicted the serious bodily injuries with the explicit goal of killing the victim, thereby concealing the rape and avoiding punishment for his crime. While penal statutes are to be strictly construed, "that maxim 'does not require "that language be strained to reach a result favorable to the defendant." ' " *Commonwealth* v. *Caracciola, supra* at 654, quoting *Commonwealth* v. *McMenimon,* 295 Mass. 467, 470 (1936). No reasonable person reading G. L. c. 265, § 22 (*a*), in light of the Commonwealth's evidence, would claim surprise on learning that the defendant was guilty of aggravated rape. See *Perry* v. *Commonwealth, ante* 282, 288 (2002); *Commonwealth* v. *Gallant,* 373 Mass. 577, 580-581 (1977).

2. The judgment of conviction of aggravated rape is affirmed.

*So ordered.*

---

[13]The judge correctly instructed the jury on both theories of aggravated rape, and the defendant does not argue otherwise.