NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

13-P-666                                          Appeals Court

COMMONWEALTH  vs.  RICKY THOMAS.

No. 13-P-666.

Hampden.     March 11, 2016. - May 26, 2016.

Present:  Meade, Sullivan, & Massing, JJ.


Rape.  Rape-Shield Statute.  Evidence, Prior conviction,
    Impeachment of credibility.  Witness, Impeachment.
    Practice, Criminal, Impeachment by prior conviction, New
    trial.



    Indictment found and returned in the Superior Court
Department on March 23, 2010.

    The case was heard by Tina S. Page, J., and a motion for a
new trial, filed on September 29, 2014, was considered by her.


    Joseph M. Kenneally for the defendant.
    Deborah D. Ahlstrom, Assistant District Attorney, for the
Commonwealth.


    MEADE, J.  After a jury-waived trial, the defendant was

convicted of aggravated rape, and the judge found him not guilty

of kidnapping and assault with intent to rape.  On appeal, he

claims that the judge erred when she excluded evidence of the

victim's prior convictions; his conviction for aggravated rape was improper because there was no aggravating circumstance; and the judge abused her discretion when she denied his motion for a new trial without holding an evidentiary hearing.  We affirm.

1.  Background.  The judge was entitled to find the following facts.  Before the incident at issue, a friend had introduced the victim to the defendant, whom she knew as "Steve," and the victim agreed to go with him to "hang out, party, chill, [and] smoke" "crack" cocaine.  Their plans for that evening did not materialize.  Several weeks later, the two again met on the street.  The defendant asked the victim if she wanted to pick up where they left off, and also if she minded going to his house in Holyoke.  The victim agreed and "jumped in [the defendant's] car."

The two travelled to an apartment complex "that had two levels, one lower one, and one up a little hill and top level apartments."  The victim had never been there before, but she identified a photograph of a "top left window" as "the window of [the defendant's] room."  On cross-examination, the victim made it clear that she went to the defendant's apartment voluntarily "to party," that is, "smoke, get high and chill."  The two entered the apartment, and the defendant directed the victim down a long, dark hallway to a room at the end of the hall on the left.  The defendant went into a bathroom on the right, and

the victim walked into the indicated room.  The room was not furnished, but there were two mattresses on the floor, a television on a stand, and "drug paraphernalia on the floor."

The victim sat on the corner of one of the mattresses, and she could hear the defendant talking in the bathroom.  She asked if he had said something, but he replied that he was just thinking out loud.  The defendant then walked out of the bathroom, "completely naked."  At that point the victim had been in the apartment "[a]bout three minutes at the most."  The defendant asked her to take her clothes off and put on a sweater that he took from the closet.  She took off her pants and sweater and shoes, put on the sweater the defendant gave her and sat back down on the bed.

The defendant sat next to her with his legs around her, and when she turned to look at him, "he just grabbed [her] real quick on [her] neck and started choking [her]."  She could not breathe and "everything was turning black."  Struggling to speak, she told him to let her go, that she would do anything, and that he did not have to do that.  Eventually, the defendant released her.  She was shocked and shaking uncontrollably because she had been "attacked . . . out of nowhere."  She asked him repeatedly why he had done that to her and he said, "I want you to suck my penis."  He said that "[she] was going to suck

his penis the whole night, that he was going to freak the fuck out of [her] until the next day."

The defendant grabbed the victim's head and started pushing her, "shoving" her to perform oral sex on him. She pulled her head back and said that she needed some water, but he grabbed her head with both hands and forced his penis into her mouth "more than once." She was afraid for her life, and "the second time, when he yanked [her] head back," she said, "[W]e know the same people" and started naming names, "just to get to him on another level to break through that, finally actually like getting some time for this man not to hurt [her]."

When she asked for water a second time, he said no, and demanded oral sex for "three more minutes." However, after a short period, she told him that she was about to throw up, and he told her he would get the water, "but don't you dare move from there."

As soon as the defendant turned his back and walked out of the room, the victim looked around "to find a way out to escape from him." She concluded that the "only way out was the door where he walked through [to the kitchen to get the water] and the window." She "got up, walked toward the window, and opened it." The defendant came back into the room and grabbed her by the sweater and pulled her back. The victim said, "No, you are going to hurt me," and she yanked the sweater off "and . . .

fell off the window."  In answering the question "[W]hat happened when he was wrestling with you, what happened to you?" the victim responded, "That is when I fell, I jumped out my sweater and I fell . . . out the window" onto the ground below. She identified a photograph of the window in the defendant's apartment as "the window I jumped out the corner of."  On cross-examination, the victim clarified, "[I]f I could have jumped, I would have calculated the way I fall, I wouldn't hurt myself that bad.  But because he grabbed me, I fell without calculating so I hurt myself even more."

After she fell, the victim lost consciousness, but she remembers that the defendant called from upstairs, saying "Come back up . . . I am not going to hurt you."  Instead, she crawled across the parking lot toward another apartment house and started "ringing every, every, every single doorbell."  One man answered his door and called the police.

Holyoke police Officer Kristin Shattuck spoke to the victim, who was visibly shaken, upset, and crying, holding the right side of her arm.  She had "a contusion to the top of her right hand, and she also had dried blood coming from the hairline on the right side of her head going down to her temple area."  She was wearing only a T-shirt and socks, with no pants, and it was cold, "about 29, 30 degrees that evening."  The

victim told the officer that the defendant had forced her to perform oral sex.

In the area beneath the defendant's window, the "dirt was . . . freshly disturbed, being winter and everything. And there was dried blood right on the foundation right below the window where if somebody had fallen, they would have hit right on the corner there. . . . There was a bent screen that was right below the window, and that window was the only one in the apartment complex . . . that was missing a screen."

The victim was hospitalized for more than a week. She sustained a concussion, a broken wrist, two broken vertebrae, a broken toe, and a cut on her leg from the screen. Hospital records revealed the presence of cocaine in her system, and she confirmed that she had smoked crack cocaine seven or eight hours before she met the defendant that day. In her opinion, there were no residual effects of the cocaine. "[T]hat is an effect that lasts seconds, not hours." She identified the defendant as the man who had assaulted her from a photographic array on the night of the incident and again, several times, during the trial.

2. Discussion. a. The rape-shield statute. The defendant claims that the judge should have denied the Commonwealth's motion in limine and permitted him to impeach the victim with prior convictions for "prostitution-related

offenses," in order "to demonstrate how she ended up in the defendant's apartment and her motive to falsely accuse him of rape." He contends that excluding this evidence denied him due process, including "the right to confront his accuser." We disagree.

At the time the judge heard the motion, which was prior to the defendant's election of a jury-waived trial, the defendant argued, "I think the fact that we have to explain to the jurors how this woman or why she ends up in this place. She is there for the purpose of smoking with no money, with nothing, Your Honor." He made no constitutional argument. The judge excluded any use of the victim's prior convictions for sexual conduct for a fee and being a common street walker, citing the rape-shield statute, G. L. c. 233, § 21B.[1] However, she ruled that the defendant could impeach the victim with a conviction for using a false name.[2] See G. L. c. 233, § 21. On appeal, it is clear that the defendant's purpose in offering the convictions was

_____

[1] In addition, as the prosecutor noted, the street walker charge appears to have been dismissed. Other charges were discussed, but the defendant did not note any objection to the judge's ruling on those charges. The record contains neither a copy of the victim's board of probation record, nor copies of any docket sheets showing convictions.

[2] The defendant did not, in fact, impeach the victim with that conviction at trial. He did ask her, "You've been arrested for assault and battery before?" The victim responded that she had and that she pleaded guilty to the charge. This occurred without objection despite the fact that no certified copy of the conviction was offered.

not, as he concedes, "to demonstrate a general lack of credibility . . . but to demonstrate how she ended up in the defendant's apartment and her motive to falsely accuse him of rape." His argument appears to be that the victim intended from the beginning of the encounter to exchange sex for cocaine, and that when she found herself on the ground under the defendant's window, she "had a motive to provide the authorities with an alternative explanation as to why she acted in the manner that she did." The argument is without merit.

"A trial judge has broad discretion to determine the proper scope of cross-examination. See Commonwealth v. Mountry, 463 Mass. 80, 86 (2012); Commonwealth v. Johnson, 431 Mass. 535, 538 (2000). 'If a defendant believes that the judge improperly restrained his cross-examination of a witness, the defendant must demonstrate that the judge abused [her] discretion and that he was prejudiced by such restraint.' Commonwealth v. Sealy, 467 Mass. 617, 624 (2014), quoting Commonwealth v. Barnes, 399 Mass. 385, 393 (1987)." Commonwealth v. McGhee, 472 Mass. 405, 426 (2015). "When the prior conviction is of a sexual offense and is being offered to impeach the [victim] in a sexual assault case, the judge's consideration of the 'prejudicial effect' of introducing the conviction should take into account the important policies underlying the rape-shield statute. . . . The judge should thus consider the potential that the jury may

misuse the conviction of a sexual offense as indicative of the
[victim's] consent, and the risk that the [victim] may be
subjected to needless humiliation." Commonwealth v. Harris, 443
Mass. 714, 727-728 (2005).

While evidence of a victim's prior sexual conduct may be
admissible to show her bias or motivation to lie, see
Commonwealth v. Houston, 430 Mass. 616, 622 (2000), nothing
about the facts here gives this victim such a motive. She was
forthcoming about her prior drug use and her intent to use crack
cocaine with the defendant on the night at issue. She agreed
that she went willingly with him and did not object to taking
some of her clothes off "to get comfortable." She also
indicated that she might have been willing to have sex with the
defendant had he not attacked her.[3] There was no abuse of
discretion.[4]

In addition, this was not a consent defense case. Although
the defendant did not testify at trial, at the time that the

_____

[3] "When he was doing that, I jumped off my neck, my head,
and I said I need water. I'm going to throw up. I feel
nauseous. I'm so shocked, I'm shaking from head to bottom. I
have no control of my body. No control at all at this point
because the shock was so severe. It happened so unexpected, so
suddenly. It was the last thing that I would expect. It would
be a mutual thing for it to happen. It could have happened, but
it was uncalled for."

[4] "Because the defendant raised no constitutional objection
at trial, we decline to address the constitutional argument he
made on appeal." Commonwealth v. Houston, supra at 619 n.4.

motion in limine was heard, his counsel denied that any sexual activity at all had taken place between the two.  Finally, there is no reason to believe that this injured victim would have believed that she would be arrested for prostitution or for any other offense had she not claimed to have been raped; as a result, she had no motive to lie about what had happened.  Contrast Commonwealth v. Joyce, 382 Mass. 222, 227 (1981).[5]

b.  Aggravated rape.  The defendant next claims that, while the evidence may be sufficient to sustain a conviction for "simple" rape, the Commonwealth failed to prove any aggravating circumstance that would justify his conviction for aggravated rape.  In particular, he says, he was not convicted of any of the felonies listed in G. L. c. 265, § 22(a), he was found not guilty of kidnapping, and, he argues, the admittedly serious injuries that the victim suffered were not inflicted by the

---

[5] "In the Joyce case, the [victim] had been charged twice with prostitution -- the second time when she had allegedly been discovered undressed in a car engaged in sexual acts.  According to the account the defendant offered of the night of the alleged rape, he and the [victim] were engaging in consensual sexual intercourse in his car when he saw a police cruiser approaching and told the [victim] to get dressed.  In offering the prior prostitution charges, the defendant 'intended to show that the [victim], having been found in a similar situation on two prior occasions, had been arrested on each occasion and charged with prostitution.'  Commonwealth v. Joyce, supra at 230.  [The court] consequently concluded that 'we cannot say that this [prostitution charge] evidence has no rational tendency to prove that the [victim] was motivated falsely to accuse the defendant of rape by a desire to avoid further prosecution" (emphasis added).  Id."  Commonwealth v. Houston, supra at 622-623.

defendant, "who neither intended nor anticipated" them.[6]  We disagree.

"General Laws c. 265, § 22(a), . . . on its face, does not require that the aggravating factor or factors be used to facilitate the unlawful sexual intercourse.  When a rape victim sustains serious bodily injury, the pertinent statutory language requires only that the intercourse have been 'committed with' the acts that resulted in the victim's injuries.  While the language 'committed with,' of course, implies some logical nexus between time and place, the words do not specifically require that the physical force precede the rape or that the injuries be inflicted to overcome a victim's will to resist."  Commonwealth v. McCourt, 438 Mass. 486, 492-493 (2003).  In the present case, the defendant, having raped the victim once, then threatened her

---

[6] The Commonwealth claims that there were facts from which the judge could have found kidnapping as an aggravating circumstance.  However, the evidence established that, at the outset, the victim went willingly to the defendant's apartment.  The only theory argued by the Commonwealth at trial to support the kidnapping charge appears in the prosecutor's opening statement:  "As far as the kidnapping and assault charges, while they were in that posture when [the victim] asked him to go get her that cup of water he threatened her and said, 'Don't you dare move while I go get that cup of water.'  And then he said things to her like, 'I am going to freak the fuck out of you all night.'  Which is, again, why she was so terrified and why she dove for the window when she had the brief moment."  While those facts might reasonably have persuaded a fact finder on the kidnapping charge, here, because the judge found the defendant not guilty of kidnapping, it is difficult to see how she could have based her verdict on kidnapping as the circumstance aggravating the rape charge.

and ordered her to remain where she was so that he could continue to rape her throughout the night. Instead, she attempted to escape through the second-floor window -- the only avenue open to her -- and, when she did so, the defendant grabbed her, as she described, precipitating a fall that did not permit her to try to protect herself as she dropped to the ground below.

In McCourt, the Supreme Judicial Court held that "[t]he Legislature's clear purpose in creating the offense of aggravated rape was to protect victims of violent sex offenders, by punishing more severely perpetrators (i) who inflict serious bodily injury on a victim, in addition to the bodily harm from the act of rape itself" (emphasis supplied). Id. at 495. The court further explained that "[t]he critical point is not whether the aggravating acts served to compel a victim's submission, but whether the rape victim sustained serious bodily injuries . . . during the same criminal episode." Ibid.

Here, the victim sustained her considerable injuries during an ongoing episode in which the defendant tried to rape her repeatedly.[7] It reasonably can be said that his actions caused her injuries, especially those actions at the window that

---

[7] While the defendant claims that his punishment should not be enhanced because he lived on the second floor, in fact, that second-floor location facilitated his efforts to prevent the victim's escape.

facilitated and exacerbated her fall. Those actions and the accompanying threats were the proximate cause of the victim's injuries. Compare Commonwealth v. Wade, 428 Mass. 147, 151 (1998) ("the judge made clear that the Commonwealth had to prove that the act that was the proximate cause of death was an act that in the natural and continuing sequence of events produce[d] the death, and without which, the death would not have occurred") (citation omitted).

The question "whether there is an adequate nexus between the unlawful sexual intercourse and the serious bodily injury . . . is a task jurors commonly are called to make. The jury are entitled to consider the entire sequence of events in making their determination whether the aggravating acts occurred in the course of the rape, or whether, because of intervening time or events, the rape and the aggravating acts cannot be viewed as one continuous course of criminal conduct directed at the victim." Commonwealth v. McCourt, supra at 496. Here, the judge, as the fact finder, clearly was persuaded that one continuous course of conduct produced the victim's serious injuries. We will not disturb that finding where it is fully supported by the evidence.

c. The motion for new trial. Finally, the defendant claims that the judge improperly denied without a hearing his motion for a new trial based on a claim that counsel was

ineffective for failing to call a witness to impeach the victim. We disagree. "The decision to hold an evidentiary hearing on a motion for a new trial is 'left largely to the sound discretion of the judge.'" Commonwealth v. Vaughn, 471 Mass. 398, 404 (2015), quoting from Commonwealth v. Stewart, 383 Mass. 253, 257 (1981). "Indeed, [Mass.R.Crim.P. 30(c)(3), as appearing in 435 Mass. 1502 (2001),] encourages the denial of a motion for a new trial on the papers, without hearing, where no substantial issue is raised." Commonwealth v. Gordon, 82 Mass. App. Ct. 389, 394 (2012).

We review the denial of a motion for a new trial for "'a significant error of law or other abuse of discretion,' Commonwealth v. Forte, 469 Mass. 469, 488 (2014), quoting from Commonwealth v. Grace, 397 Mass. 303, 307 (1986), granting 'special deference' to the rulings of a motion judge who, like the judge here, also presided at trial." Commonwealth v. Bonnett, 472 Mass. 827, 833 (2015). "'In general, failure to impeach a witness does not prejudice the defendant or constitute ineffective assistance.' Commonwealth v. Bart B., 424 Mass. 911, 916 (1997). 'Even on the more favorable standard of review under [G. L. c. 278,] § 33E [which is not applicable here], a claim of ineffective assistance based on failure to use particular impeachment methods is difficult to establish. Impeachment of a witness is, by its very nature, fraught with a

host of strategic considerations, to which we will, even on § 33E review, still show deference. . . . Furthermore, absent counsel's failure to pursue some obviously powerful form of impeachment available at trial, it is speculative to conclude that a different approach to impeachment would likely have affected the jury's conclusion.'  (Footnote omitted.) Commonwealth v. Fisher, 433 Mass. 340, 357 (2001) (counsel not ineffective in failing to impeach witness with certain prior inconsistent statements where witness was extensively impeached by other means)."  Commonwealth v. Hudson, 446 Mass. 709, 715 (2006).

Here, in support of his motion for new trial, the defendant claimed that trial counsel was ineffective for failing to call James Bradley as a witness.  According to Bradley's affidavit, submitted in support of the defendant's motion, he would have testified to the victim's prior inconsistent statements, specifically that she had been "robbing a trick" and then jumped out of the window, thinking the defendant's apartment was on the first floor.  Bradley also stated that the victim did not say anything about being attacked or sexually assaulted.

The defendant submitted a letter from trial counsel, who stated that he did not call Bradley because he understood that Bradley would have testified only that someone else had given him the information, and, further, that Bradley "had a long

criminal record and was in the middle of his own trial in the Superior Court."

The motion judge, who was also the trial judge, concluded, "There is no substantial issue because even if I credit Bradley's affidavit as to what his testimony would have been, trial counsel did not provide ineffective assistance by failing to call him as a witness." The judge did "not credit the defendant's claim that, during the trial he disagreed with trial counsel's decision not to call Bradley . . . [and e]ven if the defendant disagreed with trial counsel's decision, that decision was not manifestly unreasonable. . . ." The judge further noted that Bradley's statement would have been admissible only to impeach the victim and also that trial counsel had thoroughly cross-examined the victim and impeached her with her own inconsistencies. Any further impeachment would have been cumulative. In the judge's view, trial counsel's strategy was "manifestly reasonable," given Bradley's prior record, combined with the fact that no stolen goods were found on the victim or in the area. "Moreover, Bradley's testimony would not have been plausible because the victim jumped out of the window in January, almost naked, rather than leaving the defendant's apartment through the door with her clothes on at an opportune time." As such, it was not an abuse of discretion for the judge

to determine that motion failed to raise a substantial issue, or to deny the motion itself.

Judgment affirmed.

Order denying motion for new trial affirmed.