## Commonwealth vs. Corey Kastner.

No. 08-P-2009.

Berkshire. November 13, 2009. - January 20, 2010.

Present: Kantrowitz, Dreben, & Rubin, JJ.

*Privacy. Imprisonment,* Inmate telephone calls. *Subpoena. Practice, Criminal,* Motion to suppress, Subpoena. *Evidence,* Hearsay, Spontaneous utterance, Relevancy and materiality. *Kidnapping. Rape.*

A Superior Court judge properly denied a criminal defendant's pretrial motion to suppress recordings of certain telephone conversations that took place while he was detained as an inmate at a house of correction, where, although the recordings were not provided to the prosecution pursuant to a valid subpoena, their admission in evidence did not prejudice the defendant, nor did they violate his constitutional rights, or statutory or common-law privileges. [133-137]

This court concluded that, in view of the posture of a criminal case, there was no reversible error in the admission, as spontaneous utterances, of testimony by two witnesses as to certain statements made by the victim. [137-139]

At a criminal trial, there was no substantial risk of a miscarriage of justice in the admission in evidence of certain relevant testimony by a police officer. [139]

At the trial of indictments charging, inter alia, aggravated rape and kidnapping, the judge's response to a question posed by the jury regarding the kidnapping charge created a substantial risk of a miscarriage of justice, where the judge declined to instruct the jury that in order to find the defendant guilty of kidnapping, the jury was required to find that confinement or imprisonment of the victim exceeded the restraint necessary to commit the rape; therefore, this court vacated the defendant's conviction of kidnapping and the aggravated rape portions of his rape convictions. [139-141]

Indictments found and returned in the Superior Court Department, four on May 23, 2007, and one on July 20, 2007.

A pretrial motion to suppress evidence was heard by *John A. Agostini,* J., and the cases were tried before him.

*Michael J. Fellows* for the defendant.

*James F. Petersen,* Assistant District Attorney, for the Commonwealth.

DREBEN, J. Convicted of two counts of aggravated rape, two counts of intimidation of a witness,[1] and of kidnapping, the defendant claims the judge erred in (1) denying the defendant's motion to suppress recordings of telephone conversations he had when he was at the Berkshire County house of correction (HOC); (2) admitting two spontaneous utterances of the victim contrary to the policy underlying first complaint testimony as set forth in *Commonwealth* v. *King*, 445 Mass. 217 (2005), cert. denied, 546 U.S. 1216 (2006); (3) admitting irrelevant and prejudicial evidence of a brown stain; (4) failing properly to answer a jury's question regarding kidnapping that affected both the kidnapping and aggravated rape convictions; and (5) permitting duplicative convictions of aggravated rape. Because of the judge's failure to answer the jury's question properly, we remand for further proceedings on the kidnapping and aggravated rape convictions. We affirm the intimidation of a witness convictions.

1. *Facts.* The jury were warranted in finding the following. On April 1, 2007, the victim, then sixteen years old, having run away from her parents' home and from the custody of the Department of Social Services (DSS),[2] was living in Pittsfield with her sister. That night, she and a group of people (William Litchfield, Frank Underhill, Ryan Provenzano, Eric Daigle, and the defendant) were in her sister's apartment watching television, sniffing cocaine, and smoking marijuana.[3] The defendant was drinking liquor. He left about 11:00 P.M., but returned between 3:30 and 4:00 A.M. Without saying a word, the defendant walked through the living room where the victim and Underhill were lying on a futon watching television and went into the sister's bedroom where the sister and her boyfriend (Provenzano) were sleeping. Litchfield was sleeping on a sofa.

About ten minutes later, the victim heard a knock on the front door of the apartment. Apparently the defendant had left

---

[1]The first indictment for intimidating a witness (the victim), as well as the indictments for the other crimes, were dated May 23, 2007. The defendant was indicted on July 20, 2007, on a second count of intimidating a witness (William Litchfield). The indictments were joined for trial.

[2]That department is now called the Department of Children and Families.

[3]At the time the victim was in a dating relationship with Litchfield but was beginning to like Underhill.

the apartment through a closet in the sister's bedroom in which there was a door leading to an adjoining apartment that was vacant. When the victim answered the knock, the defendant was at the door; he grabbed her by the arm and pushed her into the kitchen of the adjacent vacant apartment. She tried to pull away. When asked at trial if she shouted, she answered, "Nothing would come out. I was scared."

Once in the kitchen of the other apartment, the defendant, over the victim's objection, began kissing her, rubbed her vagina, and then pushed her into another room which was bare except for a brown carpet and some cable wire hanging out of the wall. There, he pulled down her pants, had vaginal intercourse, turned her over onto her stomach, put his penis in her anus, turned her around, and again had vaginal intercourse. He then left.

Although the anal penetration was very painful, she did not scream. Part of the time he had his hand over her mouth. She claimed she bled quite a lot and that there was blood and excrement on the floor in the room with the carpet.

After waiting a few minutes to be sure that the defendant had left, the victim returned to her sister's apartment. She asked Daigle to leave and then locked the door. She broke down, was on her knees, and started to cry. Underhill asked her what happened. At first she did not tell him, but after about five minutes she told him, but did not give him all the details. They both woke up Litchfield and she told both of them what had happened.[4] At their urging, she woke up her sister, a certified nurse's assistant. Her sister called the police.[5] Additional facts will be set forth in connection with our discussion of the issues.

2. *Motion to suppress.* Prior to trial, the defendant filed a motion to suppress recorded conversations he had with his sister and another person during the month of June, 2007 at HOC. These conversations were relevant to the second intimidation of a witness charge, see note 1, *supra,* and to the defendant's

---

[4]Both were permitted to testify at trial as to the victim's excited utterances, an issue discussed *infra.*

[5]The victim was afraid to call the police and hid from them that night because she was "on the run." When the police came they were not told of the rape but that there was a prowler. It was only after the defendant threatened her several days later that the victim returned to DSS and, at the urging of her DSS worker, informed the police.

claim of alibi. After a hearing on the motion to suppress, the judge made findings of fact which, as supplemented by minor, uncontested details in the record, included the following. A Berkshire County grand jury indicted the defendant on May 23, 2007. The defendant pleaded not guilty on May 30, 2007 at the Pittsfield court complex. Litchfield was there on the same day. On the next day, May 31, 2007, Litchfield wrote to the district attorney's office asking that his statements to the grand jury be "thrown away" because they were based on hearsay and because he had been threatened for giving them.

Unable to post bail, the defendant was held at the HOC. Through the orientation handbook, recordings played on the telephones used by inmates, and signs above the telephones, the defendant knew at the time he made telephone calls from the HOC that the policy of the institution was to monitor and record inmates' conversations except for calls to counsel and clergy.

On June 7, 2007, Litchfield repeated his account of threats to Detective Dale Eason of the Pittsfield police department, who was working for the district attorney. Litchfield told Eason that his life had been threatened. Eason informed Captain Dale Newberry at the HOC of the threat, and Newberry responded that the defendant in a June 1, 2007 recorded conversation to his sister indicated that he knew of the statements given by "Kid Frankie" and Litchfield.[6]

Eason then requested copies of the recordings of the defendant's telephone calls for the month of June, 2007, and HOC staff complied. As a result of Eason's investigation, the grand jury indicted the defendant on a second charge of witness intimidation. The motion judge found that the recorded phone call of June 1, 2007, although not presented to the grand jury, was relevant to that indictment.

On April 23, 2008, a day after the prosecution learned that the defendant intended to call his sister as an alibi witness,

---

[6]Newberry, who monitors inmates' calls, learned that the defendant had told a woman on June 1, 2007 that he knew that two persons, "Kid Frankie and Billy" (whom Newberry believed to be Litchfield, who was also at the HOC) had given police statements about the defendant's involvement in the alleged kidnapping and rape. Newberry noted this on the log "for a possible enemy situation."

Eason informed the district attorney that in one of the defendant's recorded June, 2007 telephone calls, the defendant said that he had been in Holyoke on the night of the incident, a statement that weakened his alibi. That same day, the district attorney informed defense counsel of the tapes and, on April 25, gave counsel disks of the recordings.[7]

From 2001 to February, 2008, the HOC had in place a written procedure concerning disclosure of information about inmates' recorded telephone calls to outside law enforcement officers. That procedure permitted disclosure without request "only as reasonably necessary to promote legitimate operational standards, law enforcement or public safety purposes." It provided that in cases where a request was made by outside law enforcement to obtain information, a written request for monitoring had to be made; past recordings would only be released though a subpoena; and monitoring or listening by outside law enforcement agencies would be allowed only through an authorized search warrant.

The judge found that the release of the tapes to Eason in 2007 "plainly violated the subpoena requirement in place at that time under the written HOC procedures." Nevertheless, he found that this violation did not render the evidence inadmissible. At trial, the tapes were admitted over the defendant's objection.

The judge's conclusion is supported by recent decisions of the Supreme Judicial Court issued after his decision and after the briefs were filed in this appeal.

In *Matter of a Grand Jury Subpoena*, 454 Mass. 685, 688-689 (2009), the court held that the policy of the Suffolk County sheriff's department of monitoring and recording detainees' and inmates' telephone calls, preceded by notice to all parties and justified by legitimate penological interests, did not violate the privacy interests of the detainees or inmates under either the Fourth Amendment to the United States Constitution or art. 14 of the Massachusetts Declaration of Rights.[8] Accordingly, the court held, in the absence of a recognized common-law or statu-

---

[7]Through inadvertence, no working copy of the June 1, 2007 recording was given to the defendant until May 8, 2008, the second day of the hearing on the motion to suppress. Trial did not commence until September 2, 2008.

[8]The court also held, citing *Cacicio* v. *Secretary of Pub. Safety*, 422 Mass. 764, 770-773 (1996), that valid penological interests justified the sheriff's policy. *Matter of a Grand Jury Subpoena*, 454 Mass. at 690.

tory restriction, there was no bar to the production of the records to the grand jury and "no limitation on their admissibility as evidence at trial." *Id.* at 693. A subsequent case, *Commonwealth* v. *Hart*, 455 Mass. 230, 244 & n.13 (2009), held that the reasoning of *Matter of a Grand Jury Subpoena* "applies equally to a trial subpoena."

The court in *Matter of a Grand Jury Subpoena*, 454 Mass. at 689 n.6, also noted:

> "Because the sheriff records and monitors detainees' and inmates' calls in order to detect and deter criminal activity occurring within or without the facility that is being facilitated through use of the facility's telephone system, it would not be reasonable to expect that evidence of criminal activity in those recordings might not be provided to law enforcement authorities — regardless whether the sheriff does so on her own initiative in order that such criminal activity might be investigated, or whether she does so in response to an investigation being conducted by a grand jury, as was the case here."

See *id.* at 690-691 n.8.

Thus, when Eason told Newberry that Litchfield claimed he was threatened, it was natural and proper for Newberry to inform him of the June 1, 2007 phone call.

The procedure that followed for obtaining the tapes was, however, not in accordance with the requirements of our cases. Quite apart from HOC policy, it is now settled that "a party seeking pretrial production of third-party records must file a motion seeking prior judicial approval" and must satisfy certain standards. *Commonwealth* v. *Odgren*, 455 Mass. 171, 178-183 & n.22 (2009). See *Commonwealth* v. *Lampron*, 441 Mass. 265, 268-271 (2004).[9] Here, despite the lack of a valid subpoena, in

---

[9]Although the procedure for obtaining the recordings was not followed, there is no indication that the standards were not met. As stated in *Commonwealth* v. *Odgren*, 455 Mass. at 183 n.22, those standards require:

> " 'The party moving to subpoena documents to be produced before trial must establish good cause, satisfied by a showing "(1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain

the absence of prejudice,[10] violation of a constitutional right, or statutory or common-law privilege, the evidence was admissible. See *Commonwealth* v. *Odgren*, 455 Mass. at 188; *Commonwealth* v. *Hart*, 455 Mass. at 243-244. Cf. *Commonwealth* v. *Torres*, 45 Mass. App. Ct. 915, 916 (1998).

Accordingly, the motion judge did not err in denying the defendant's motion to suppress.

3. *Admission of spontaneous utterances.* At trial, Underhill and Litchfield testified to statements made by the victim when she returned to the apartment after leaving with the defendant. On the first day of trial, the defendant filed a motion in limine that the Commonwealth be required to identify the first complaint witness. The prosecution indicated that there would not be a first complaint witness, but rather that there would be excited utterances from the people who were in the apartment when the victim returned. Defense counsel then said, "if there is no testimony being offered for first complaint, then there is no issue."

During several discussions at trial, the defendant's objections to the testimony of Underhill and Litchfield were based on the claim that the victim's statements were not excited utterances and should not be admitted on that basis. In view of the victim's testimony that she broke down, was on her knees and crying, and Litchfield's description that she was bruised, screaming, and crying when she came back into the apartment no more than twenty minutes after having left with the defendant, we consider the judge acted within his broad discretion in viewing the state-

---

such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general 'fishing expedition.' " ' *Lampron*, 441 Mass. at 269, quoting *United States* v. *Nixon*, 418 U.S. 683, 699-700 (1974)."

Contrary to the defendant's contention, nothing suggests that Eason's request for the tapes of the June conversations was a general fishing expedition, but rather it was elicited in response to the disclosure to him of the June 1, 2007 phone call that Newberry viewed as a "possible enemy situation." See note 6, *supra.* The request was limited to a circumscribed period. See *Commonwealth* v. *Odgren*, 455 Mass. at 188. The weakening of the defendant's alibi evidence appeared on the tapes covering that circumscribed period.

[10]The relevant prejudice is whether the defendant receives the material sufficiently before trial to prepare a defense, not whether the admissible evidence is inculpatory. See *Commonwealth* v. *Odgren*, 455 Mass. at 188; *Commonwealth* v. *Hart*, 455 Mass. at 243.

ments as spontaneous utterances. See *Commonwealth* v. *Ruiz*, 442 Mass. 826, 832 (2004).

In his initial brief on appeal, the defendant again argues that the victim's statements were the product of reflection and not a mere spontaneous response to a recent shock. He concludes his argument on the issue by saying that the statements were admitted substantively and not just as corroboration as would have been the case had one or the other witness been allowed to testify as a first complaint witness. Only in his reply brief does the defendant develop the argument that the admission of hearsay under the spontaneous utterance exception was improper, was prejudicial, and allowed the Commonwealth to avoid the limitations of the first complaint doctrine, as explained in *Commonwealth* v. *King*, 445 Mass. at 242-243. He stresses the rule that only one witness may testify.[11] In addition to failing to object at trial, thus incurring a more stringent standard of review (whether the error, if any, created a substantial risk of a miscarriage of justice), the defendant, as indicated, did not adequately address the issue in his initial brief. The Commonwealth did not raise it in its brief, and only in the reply brief did the defendant specifically raise the issue. The argument, therefore, came too late. See *Kelley* v. *Rossi*, 395 Mass. 659, 665 n.6 (1985), and cases cited.

An examination of the testimony of Underhill and Litchfield indicates that there was no substantial risk of a miscarriage of justice. Underhill's testimony was mild in comparison to the victim's story and was so evasive that in the midst of his testimony he was designated as a hostile witness. He stated that originally the victim had indicated she had sex with the defendant, and only after Litchfield became angry did she claim she was raped. See note 3, *supra.* Litchfield's testimony was also flat compared to that of the victim.

---

[11]Recent cases indicate that evidence of additional complaints, even if they fall within independent exceptions to the hearsay rule, are inadmissible if they "serve[] no purpose other than to repeat the fact of a complaint and thereby corroborate the complainant's accusation." *Commonwealth* v. *Arana*, 453 Mass. 214, 229 (2009); *Commonwealth* v. *Monteiro*, 75 Mass. App. Ct. 489, 494-497 (2009). Thus, in some circumstances, the policies of the first complaint rule will preclude the receipt of spontaneous utterances in addition to evidence of a first complaint, or in substitution of first complaint evidence. *Commonwealth* v. *McGee*, 75 Mass. App. Ct. 499, 504 (2009).

In sum, in view of the posture of the case, there was no reversible error in the admission of the testimony of more than one witness.

4. *Brown stain.* The defendant claims error in the introduction of testimony of a police officer that he saw a brown stain on the carpet in the room in which the victim claimed she had been raped. At trial, however, the defendant did not object to that testimony nor to the prosecutor's closing argument discussing the stain. The question of relevance is a matter for the trial judge and we see no error in the admission of the officer's testimony. That the officer had no opinion as to the cause of the stain is not determinative. There was no substantial risk of a miscarriage of justice.

5. *Answer to jury's note.* Some of the relevant portions of the judge's original charge on kidnapping and aggravated rape are set forth in the margin.[12] On the second day of jury deliberations, the jury sent a note asking the following question:

> "Is it considered kidnapping if a person is held down on the floor against her will and not let up?"

---

[12] "In order to establish the Defendant's guilt of kidnapping, the Commonwealth must prove the following . . . elements to you beyond a reasonable doubt: First element, that the Defendant forcibly confined or imprisoned another person, in this case [the victim] within the Commonwealth.

". . .

"The first element that the Commonwealth must prove beyond a reasonable doubt is that the Defendant forcibly confined or imprisoned [the victim] in Massachusetts. The word forcibly means carried out through the use of force. One acts forcibly towards another if one compels, constrains or obligates her to do something against her will. Force may either be actual or constructive. So there needs not be actual physical force applied against the alleged victim. It's sufficient that the alleged victim is subdued by a display of potential force. Confined means to enclose within bounds or limits, to restrict, shut up or keep in. It's a restraint on a person's movement. Imprisoned means to detain in custody or to hold in restraint. A restraint of a person's liberty is a confinement or an imprisonment.

". . .

"Now, let me turn to the charge of aggravated rape.

". . .

"In order to prove the Defendant guilty of aggravated rape, the Commonwealth must prove the following three elements beyond a reasonable doubt: First element, the Commonwealth must prove beyond a reasonable doubt that the Defendant engaged in sexual intercourse, either natural or

The prosecutor, pointing out that since rape itself obviously involves some restriction on a person's movement, suggested that the judge reinstruct on kidnapping and further instruct along the following lines:

> "I further instruct you that, in order to find the Defendant guilty of kidnapping, you must find that the enforceable [*sic*] confinement or imprisonment of the named victim exceeded the restraint necessary to commit the rape."

Defense counsel, on the other hand, wanted the judge merely to reinstruct on kidnapping, leaving to the jury the factual determination.

The judge then instructed:

> "Ladies and gentlemen, with respect to this question, you are asking me to do something that I certainly don't have the power to do. That is, take certain facts, apply them to the law and reach a conclusion. That is your responsibility. Now, I can certainly reread to you the instruction on kidnapping. I gave you a copy, or if you have a specific question with respect to the law of kidnapping, I may be able to help you on that. But I can't answer this question because I would be intruding on what a jury's function is."

unnatural, with the complainant . . . . Second element, the Commonwealth must prove beyond a reasonable doubt that the sexual intercourse was accomplished by compelling the complainant to submit by force or threat of bodily injury and against her will. Third element, that the rape was committed during the commission of the crime of kidnapping.

". . .

"Now, aggravated rape requires the Commonwealth to prove one additional element beyond a reasonable doubt. In order to prove the Defendant guilty of aggravated rape, the Commonwealth must prove beyond a reasonable doubt that the rape was committed during the commission of or attempted commission of the crime of kidnapping. The crime need not occur at the same time, but that the offense must constitute one continuous episode and course of conduct. In other words, the crime of kidnapping and the rape cannot be two separate events that were not part of a continuous episode. The critical point is not whether the aggravating act served to compel a victim's submission but whether the rape victim was subjected to another felonious conduct during the same criminal episode. If the Commonwealth proves this additional element, it shall be considered aggravated rape. Now, please keep in mind my definition of kidnapping that I gave you in the first instruction in evaluating this charge."

The Commonwealth was correct, and its suggestion should have been followed. See *Commonwealth* v. *Rivera*, 397 Mass. 244, 254 (1986). If the confinement of the victim during the rape itself did not exceed the restraint which was incident to the rape, it did not constitute the crime of kidnapping, separate and apart from the rape. See *Commonwealth* v. *Kickery*, 31 Mass. App. Ct. 720, 723 (1991), overruled on other grounds, *Commonwealth* v. *McCourt*, 438 Mass. 486, 496 n.12 (2003). Because the jury may have been misled by the judge's answer and may have improperly found the defendant guilty of kidnapping by reason of the restraint incident to the rape, there is a substantial risk of a miscarriage of justice here. The conviction of kidnapping must be vacated. Similarly, the convictions of aggravated rape (by reason of kidnapping) must be vacated.

The defendant's claim that the convictions of aggravated rape were duplicative because they arose out of a set of facts so closely related as to constitute a single crime is without merit. There was evidence of at least two separate rapes, one vaginal, and one anal.

Only the kidnapping and the aggravated aspect of the rape convictions need be vacated, as there was ample evidence of the lesser included offenses of rape and no doubt as to the jury's verdict in those respects.

Therefore, on remand the Commonwealth has the option of moving to have the defendant sentenced on the lesser included offenses of rape or of retrying the defendant on the kidnapping and aggravated rape indictments. The guilty verdicts on the kidnapping indictment and on so much of the rape indictments that charged the rapes to be aggravated are vacated. The guilty verdicts on the indictments charging intimidation of a witness are affirmed. The matter is remanded to the Superior Court for further proceedings in accordance with this opinion.

*So ordered.*