COMMONWEALTH vs. ISMAEL GARCIA.

No. 07-P-1699.

Bristol. December 2, 2011. - July 25, 2012.

Present: KANTROWITZ, RUBIN, & AGNES, JJ.

*Dangerous Weapon. Statute,* Construction. *Practice, Criminal,* Assistance of counsel, Instructions to jury, Witness, Attendance of witnesses. *Mayhem. Words,* "Dirk knife," "Dagger."

Discussion of the crime of possession of a dangerous weapon, G. L. c. 269, § 10(*b*), and of the definitional scope of "dirk knife" and "dagger," two prohibited weapons listed in that statute. [242-247]

At the trial of indictments charging, inter alia, possession of a dangerous weapon in violation of G. L. c. 269, § 10(*b*), the evidence was sufficient for a rational jury to conclude that the weapon in question was a dagger, i.e., a blade of relatively short length primarily designed or modified for stabbing. [247-249]

At a criminal trial, no substantial risk of a miscarriage of justice arose from the judge's improper instructions to the jury on the elements of possession of a dangerous weapon where the weapon was not found on the defendant at the time of the arrest, given that the erroneous instruction concerned an element that the defendant did not contest at trial. [249-250]

At a criminal trial, there was sufficient evidence of the severity of the victim's wounds for a rational jury to convict the defendant of the crime of mayhem. [250-251]

There was no merit to a criminal defendant's claim that his trial counsel was constitutionally ineffective in failing to file a motion to suppress the defendant's telephone statements made while in pretrial detention, where the recording of such telephone calls was, at the time, not unlawful, and where, at any rate, suppression would not have been warranted. [251-252]

In the circumstances of a criminal trial, the judge's decision not to give a missing witness instruction due to the victim's failure to testify was not manifestly unreasonable. [252-253]

INDICTMENTS found and returned in the Superior Court Department on December 16, 2005.

The cases were tried before *D. Lloyd Macdonald,* J., and motions for a new trial and for postconviction discovery, filed on June 6, 2008, were heard by him.

*James A. Reidy* for the defendant.

*Tara L. Blackman*, Assistant District Attorney, for the Commonwealth.

AGNES, J. On October 12, 2006, a jury returned guilty verdicts against the defendant, Ismael Garcia, on indictments charging carrying a dangerous weapon, pursuant to G. L. c. 269, § 10(*b*), and mayhem, pursuant to G. L. c. 265, § 14. On appeal, the defendant raises arguments regarding the sufficiency of the evidence and the correctness of the jury instructions on the possession of a dangerous weapon conviction. He also alleges insufficiency of the evidence on the mayhem conviction, ineffective assistance of counsel regarding the introduction of pretrial statements made while he was in detention,[1] and error on the part of the trial judge in failing to give a missing witness instruction. We affirm.

*Factual background.*[2] 1. *The stabbing.* Late in the evening of September 5, 2005, Robert DeMenzes (the victim) and his girlfriend, Kendra Anderson, were "hanging out" in Ruggles Park in Fall River. Earlier that evening the victim had departed from the park looking to buy marijuana from an individual named "E."

The incident at the heart of this case occurred when "E" and the defendant pulled up to the park in a black car with a dent on the side. At this point, the victim was quite drunk. The defendant was holding an item that Anderson at first thought was a pipe or a bat, but later ascertained was "something teenagers now call pimp canes." Anderson described the "pimp cane" as between twelve and eighteen inches long. At another point she said it was eleven inches long including the handle, admitting she was "not really sure about the length." The defendant began speaking in another language while advancing into the park. "E" was standing right behind the defendant, scream-

---

[1]The defendant also makes a due process argument regarding the introduction of these statements, but tacitly admits that this argument is precluded by *Matter of a Grand Jury Subpoena*, 454 Mass. 685, 688-690 (2009). We thus do not address this argument.

[2]Parts of the factual record were disputed below, such as the identity of the assailant. In light of the jury's verdicts, we recount the version of events presented in the Commonwealth's case except where the defendant's version is relevant to the issues raised on appeal.

ing that he had a gun and that everybody should "back the F up."[3]

At this point, the defendant pulled the cover off the "pimp cane," revealing, Anderson testified, a "big blade" that was about eleven inches long.[4] The defendant ran at the victim, screaming things. After a warning shout from Anderson, the victim ran from the defendant. At around the same time, Anderson jumped on the defendant's back and tried to pull him away from the victim. Although Anderson was somewhat successful at first, the defendant broke free and ran after the victim. The victim fell to the ground, either because he tripped or due to his intoxication, at which point the defendant caught up with him. The defendant then repeatedly stabbed the victim with the blade, through his back and arm and "from side to side in his stomach." The victim attempted to block these attacks with his arms, which were sliced as a result. The defendant then kicked the victim in the head three times with his sneakers. At this point, the black car came down the street and both "E" and the defendant jumped in. The car then drove off. The whole incident lasted less than five minutes.

Anderson picked the victim up and carried him to the steps of a house near the street. The victim was "covered in blood" and his intestines were hanging out. Something fell out of his side while they were on the steps of the house.[5] The police and an ambulance eventually arrived at the scene and took the victim to the Charlton Memorial Hospital. The doctor who treated the victim at the hospital determined that he had suffered at least three stab wounds. The victim had dried blood in a variety of areas and was described as minimally responsive and in critical condition. The doctor further stated that the victim's wounds were "life-threatening." The victim's blood pressure was also

---

[3]The record indicates there were at least a handful of other people in the park at the time.

[4]This blade was described as and referred to as a "sword" during the course of the trial.

[5]A photograph of "[t]he steps and the pile of the stuff that came out of [the victim's] body on the side of it" was admitted in evidence, but it is not contained in the record on appeal. Without the photograph we cannot assess whether it had any impact on the sufficiency of the evidence of the victim's wounds.

"quite low," which, in conjunction with the stab wounds, led the doctor to believe that he had severe internal bleeding. The doctor did what he could to stabilize the victim but, due to the complexity of his injuries, decided to transfer him to the trauma center at the Rhode Island Hospital.

2. *The jailhouse recordings.* The defendant was indicted on December 16, 2005, and held pending trial. While in the Bristol County house of correction, he had conversations in which he made incriminating statements. At the Bristol County house of correction, all inmate telephone calls except attorney calls were recorded pursuant to department policy. The defendant was made aware of this policy by the "Bristol County Sheriff's Office Inmate Orientation, Handbook & Rules," a four-page document that he signed.

Prior to trial, the Commonwealth sent a subpoena to John Silva at the Bristol County sheriff's office, directing him to appear before the court on or before June 1, 2006,[6] in order to "give evidence" regarding the defendant's case. See G. L. c. 277, § 68. The subpoena specifically requested that Silva bring with him any audio recordings of calls to or from the defendant from September 15, 2005, through June 1, 2006. The subpoena further requested that Silva forward an additional copy of the recordings directly to the Bristol County district attorney's office. On May 3, 2006, the sheriff's office sent the recordings to the district attorney's office. On June 1, the prosecution sent the recordings to the defense counsel along with other discovery materials he planned to use at trial. The recordings were accompanied by a letter indicating that the prosecutor intended to introduce the incriminating calls in evidence and that he would call Silva as a witness at trial. The trial began on October 10, 2006.

*Discussion.* 1. *Possession of a dangerous weapon.* a. *Statutory standard.* The crime of possession of a dangerous weapon pursuant to G. L. c. 269, § 10(*b*),[7] as amended through St. 1986, c. 581, § 1, is a single offense which can be proved in one of two different ways depending on whether the defendant

---

[6]This was the date of the final pretrial conference.

[7]General Laws c. 269, § 10(*a*) and (*c*), set out separate offenses regarding the possession of firearms. These crimes are not relevant to the present case.

was carrying the weapon at the time of his arrest. Where, as here, the weapon is not on the defendant's person at the time of his arrest, the Commonwealth is required to prove that the defendant

> "carrie[d] on his person . . . any stiletto, dagger, or a device or case which enables a knife with a locking blade to be drawn at a locked position, any ballistic knife, or any knife with a detachable blade capable of being propelled by any mechanism, dirk knife, any knife having a double edged blade, or a switch knife, or any knife having an automatic spring release device by which the blade is released from the handle, having a blade of over one and one-half inches . . . ."

G. L. c. 269, § 10(b). In contrast, the statute provides for an alternative mode of proof of guilt in cases in which the defendant is arrested on a warrant or for a breach of the peace and has the alleged dangerous weapon on his person at the time of arrest. In such cases, the statute provides that the defendant is guilty of a § 10(b) violation if he is "armed with or has on his person . . . a billy or other dangerous weapon other than those herein mentioned and mentioned in paragraph (a) . . . ." In each case, the offense is a felony punishable by up to five years in State prison. The effect of the statute's language is that if a person is not armed at the time of his arrest, as in this case, the Commonwealth is required to prove that the defendant possessed one of the weapons enumerated in the statute.

In this case, the prosecutor did not argue at trial that the weapon possessed by the defendant was one of those specific weapons enumerated in G. L. c. 269, § 10(b). However, the prosecutor argued on the defendant's motion for a new trial, and also argues on appeal, that the defendant's weapon was a "dirk knife," one of the enumerated weapons in G. L. c. 269, § 10(b).[8,9] The defendant contends that the weapon described

---

[8] The prosecutor also suggested during the motion hearing that the sword could have been "a device or case which enables a knife with a locking blade to be drawn at a locked position." Under the circumstances it is not necessary to discuss this issue.

[9] Insofar as the Commonwealth relies on Commonwealth v. Molligi, 70 Mass. App. Ct. 108, 112-113 (2007), to support a claim that dangerous weapons

by the witness falls under none of the weapons prohibited by the statute. Because we find that the weapon possessed by the defendant could not be considered a "dirk knife" under the statute, we explore the definitional scope both of "dirk knife" and of the other prohibited weapons listed in G. L. c. 269, § 10(*b*), in particular that of "dagger[s]." In so doing, we are mindful that in interpreting statutes, "[w]ords and phrases shall be construed according to the common and approved usage of the language," except where they have acquired a "peculiar and appropriate meaning in law." G. L. c. 4, § 6, Third. See *Commonwealth* v. *McDowell*, 62 Mass. App. Ct. 15, 20 (2004).[10] We must presume that the Legislature is familiar with common-law definitions of the terms it uses in a statute. See *Commonwealth* v. *Fortier*, 56 Mass. App. Ct. 116, 120 (2002).[11] "If the language of the statute is 'fairly susceptible [of] a construction that would lead to a logical and sensible result' . . . we will construe [it] so 'as to make [it an] . . . effectual piece[] of legislation in harmony with common sense and sound reason.' " *Commonwealth* v. *Williams*, 427 Mass. 59, 62 (1998), quoting from *Commonwealth* v. *A Juvenile*, 16 Mass. App. Ct. 251, 254 (1983). However, regardless of the interpretive rule applied, any construction of a statute must give way when its observance "would involve a construction inconsistent with the manifest

---

not specifically listed in G. L. c. 269, § 10(*b*), can form the basis for the defendant's conviction, the argument fails. Unlike the present case, the defendant in *Molligi* was carrying the relevant weapon at the time he was arrested. *Id.* at 109. As a result, as discussed *supra*, under the terms of the statute, the Commonwealth could satisfy its burden of proof without tying the weapon to one specifically listed in G. L. c. 269, § 10(*b*), in distinct contrast to the present case.

[10]"When interpreting a statute, we attempt to give effect to the intent of the Legislature as ascertained from the ordinary use of the language employed, the reasons for the enactment, and the main object to be accomplished. The language of the statute itself is our primary source of insight into legislative purpose. For assistance with interpretation, we may utilize other statutes relating to the same matter as the statute being construed, and we may examine the general statutory framework in which the statute in question is located." *Commonwealth* v. *McDowell*, 62 Mass. App. Ct. at 20 (citations omitted).

[11]See, e.g., *Commonwealth* v. *Wynton W.*, 459 Mass. 745, 749 (2011) (in construing phrase "dangerous weapon" as it appears in G. L. c. 269, § 10[*j*], court noted that phrase "has a defined meaning under the common law that is routinely applied to those statutory crimes that have a dangerous weapon element").

intent of the law-making body." *Commonwealth* v. *Moran*, 80 Mass. App. Ct. 8, 11 (2011).[12] We note also, as Justice Kaplan put it in a different context, no form of words is "self-interpreting." *Antonellis* v. *Northgate Constr. Corp.*, 362 Mass. 847, 851 (1973). Finally, because this is a criminal case, the statute must be construed strictly, and any ambiguity resolved in favor of the defendant. See *Commonwealth* v. *Lupo*, 394 Mass. 644, 649 (1985).

The leading case in Massachusetts on the definition of "dirk knife" is *Commonwealth* v. *Miller*, 22 Mass. App. Ct. 694 (1986). That case noted that Webster's Third New International Dictionary 642 (1971) defined a " 'dirk knife' [as] a 'clasp knife,' . . . having a large blade like that of a dirk.' " *Commonwealth* v. *Miller, supra* at 695. This definition is consistent with the usage of the term since before the statute was enacted in 1906 (St. 1906, c. 172, § 2). See Webster's International Dictionary 417 (1890) ("Dirk Knife" defined as "[a] clasp knife having a large, dirk like blade"; "Dirk" defined as "[a] kind of dagger or poniard").[13] See also 4 Oxford English Dictionary 709 (2d ed. 1989) (defining "dirk knife" as "a large clasp-knife with a dirk-shaped blade").[14] Currently, Webster's Third New International Dictionary 642 (2002) also defines

---

[12]To this end, while we make reference to dictionary definitions in construing the terms of G. L. c. 269, § 10(*b*), we do so with the understanding that "it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning." *United States* v. *Costello*, 666 F.3d 1040, 1043 (7th Cir. 2012), quoting from *Cabell* v. *Markham*, 148 F.2d 737, 739 (2d Cir. 1945) (Hand, J.). See *United States* v. *Costello, supra* at 1044 ("Dictionary definitions are acontextual, whereas the meaning of sentences depends critically on context, including all sorts of background understandings"). Courts also must be cautious because of the "fundamental indeterminacy" of so many dictionary definitions. See Note, Looking It Up: Dictionaries and Statutory Interpretation, 107 Harv. L. Rev. 1437, 1445 (1994).

[13]See also A Standard Dictionary of the English Language 519 (1895) (defining "dirk knife" as a "clasp knife with a large dirk-shaped blade" and "dirk" as a "dagger or poniard"); Webster's Third New International Dictionary 642 (2002).

[14]The same authority defines a "dirk" as "a kind of dagger or poniard," specifically "[t]he dagger of a Highlander," or "[a] small sword or dagger formerly worn by junior naval officers on duty." 4 Oxford English Dictionary 709 (2d ed. 1989). The Oxford English Dictionary's approach, by which a

"dirk knife" as a "clasp knife having a large blade like that of a dirk." "Dirk" is defined as "a long straight blade dagger . . ." or "a short sword . . . ."[15] *Ibid.* A "clasp knife" is, in turn, defined as "a large pocketknife the blade or blades of which fold or shut into the handle." Webster's Third New International Dictionary 416 (2002).[16] While *Miller* did not directly address whether a weapon must be folding in order to be considered a "dirk knife," that question is central to our analysis here. Based on these definitions, we conclude that one of the prerequisites for a weapon to be considered a "dirk knife" is that its blade folds into its handle.

Daggers, however, are a class of weapons that do not have this limitation. Historically, the term "dagger" has been considered a "general term" for a "short weapon used for stabbing" that includes poniards, stilettos, and dirks. Webster's International Dictionary 365 (1890). See A Standard Dictionary of the English Language 464 (1895) ("dagger" defined as "[a] short edged and pointed weapon fitted primarily for stabbing; a general term covering the dirk, stiletto, poniard, etc."). The broad scope of this term remains to this day. See Webster's Third New International Dictionary 570 (2002); *State* v. *Harrell*, 342 S.W.3d 908, 914 (Mo. App. 2011).[17]

As we recognized in *Miller*, 22 Mass. App. Ct. at 696, the legislative purpose of G. L. c. 269, § 10, was "to outlaw the carrying of those knives which are primarily designed for stab-

"dirk" is defined as a particular weapon within a more general category of weapons known as "daggers," is consistent with the approach we take. See text *infra.*

[15]The statute bans carrying a "dirk knife" but not a "dirk."

[16]The term "clasp knife" has meant a knife, the blade of which folds into the handle, since before the enactment of the statute. See Webster's International Dictionary 262 (1890); A Standard Dictionary of the English Language 348 (1895).

[17]"Daggers may be described as falling into one or more specific varieties including poniard, dirk, facon, military-issued combat knifes, stilettos, or rondel. When these historical archetypes, as well as the dictionary definitions, are examined, several attributes repeatedly appear including a fixed or locking blade, with sharpened edges, shorter than a sword and longer than an ordinary pocketknife, ranging between 4 and 25 inches, hilt, and designed with the intent to be used primarily for stabbing during combat." *State* v. *Harrell*, 342 S.W.3d at 914, quoting from *State* v. *Payne*, 250 S.W.3d 815, 820-821 (Mo. App. 2008).

bing human beings or for other unlawful objectives."[18] Other jurisdictions, perhaps recognizing a similar legislative intent, have interpreted the term "dagger" to mean a blade that, by design, is intended for stabbing. See *People* v. *Pettway*, 233 Cal. App. 3d 1067, 1069-1070 (1991) ("Dirk and dagger are used synonymously and consist of any straight stabbing weapon . . . . They may consist of any weapon fitted primarily for stabbing");[19] *State* v. *Giltner*, 56 Haw. 374, 375 (1975) (dagger as used in statute prohibiting carrying certain dangerous weapons defined as "a short weapon used for stabbing"); *Huebner* v. *State*, 103 Nev. 29, 30 n.1 (1987) ("a dagger is a short weapon used for thrusting and stabbing"); *State* v. *Pruett*, 37 Or. App. 183, 187 (1978) (Joseph, J., concurring) ("Dirks and daggers are designed and are useful almost exclusively for stabbing"); *Thompson* v. *Commonwealth*, 277 Va. 280, 290 (Va. 2009) ("A 'dagger' is 'a short knife used for stabbing' "). In light of the long-standing definitions of the terms and of the purpose of G. L. c. 269, § 10(*b*), we recognize that, under that section, a dagger is any blade of relatively short length primarily designed or modified for stabbing. This definition excludes common household items such as a steak knife which are designed primarily for utilitarian purposes.[20]

b. *Sufficiency of the evidence.* We determine sufficiency of the evidence under the familiar standard, "whether after viewing the evidence in the light most favorable to the prosecution,

---

[18]See note 12, *supra*, discussing the importance of considering the legislative purpose in construing statutes.

[19]California added a statutory definition of the terms "dirk" and "dagger" beginning in 1994. See *People* v. *Rubalcava*, 23 Cal. 4th 322, 327-329 (2000). Under California law, a "dirk" or "dagger" is defined as a weapon that is "capable of ready use as a stabbing instrument that may inflict great bodily injury or death." *Id.* at 327-328, citing Cal. Penal Code § 12020(c)(24). In *Rubalcava*, the California Supreme Court observed that prior to the statute, the courts of California applied the common-law definition of these terms. The court noted that the terms "dirk" and "dagger" were used synonymously to refer to "any straight stabbing weapon" or any weapon "fitted primarily for stabbing." *Id.* at 328-329.

[20]See *Knight* v. *State*, 116 Nev. 140, 146 (2000) ("A steak knife is a 'pointed' implement that may be employed as a weapon 'for thrusting and stabbing.' Nevertheless, a steak knife is not primarily designed or fitted for use as a weapon"). On the other hand, a household item modified for stabbing may fall within the definition of a dagger.

*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original). *Commonwealth* v. *Nee*, 458 Mass. 174, 180 (2010), quoting from *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979). Contrary to the Commonwealth's contention, there was not sufficient evidence that the weapon in question is a "dirk knife" under G. L. c. 269, § 10(*b*).[21] As outlined *supra*, a "dirk knife" is, by definition, a weapon in which the blade folds into the handle. No evidence was presented to suggest that the blade of the weapon possessed by the defendant folded into its handle.

However, sufficient evidence was presented to the jury to find that the weapon possessed by the defendant was a "dagger" under G. L. c. 269, § 10(*b*). See *Commonwealth* v. *Va Meng Joe*, 425 Mass. 99, 102 (1997) (appellate court free to affirm ruling on grounds different from those relied on by motion judge). As noted *supra*, "dagger" is a general term that refers to a relatively short weapon primarily designed for stabbing. The weapon possessed by the defendant was described as a "big blade" which with the handle measured "eleven inches." The blade was contained in what initially appeared to be a "pipe or a bat" that was "[b]etween twelve and eighteen inches" in length, but which the witness later realized was a "pimp cane." That the blade could be held within a cane leads to a strong inference that it was a slim blade.

Viewing this evidence in the light most favorable to the Commonwealth, a rational trier of fact could find that the blade was a "dagger" under G. L. c. 269, § 10(*b*). The efficacy of the weapon at stabbing was graphically and tragically demonstrated by the stab wounds sustained by the victim in this case. That the weapon was designed for stabbing is buttressed by the inference that it was a relatively slim weapon. The defendant has suggested no alternative innocuous usage for the weapon, nor is

[21]The indictment in this case makes specific reference to a violation of "G. L. c. 269, § 10(*b*)," and describes the "dangerous weapon" as "a sword." Although the indictment does not use the word "dagger," the fact that a "dagger" is specifically referred to in § 10(*b*) and, as we explain in this opinion, is a general term that includes blades like the one possessed by the defendant, renders any variation between the indictment and the proof immaterial. See G. L. c. 277, §§ 34, 35. The defendant could have filed a motion for a bill of particulars. See G. L. c. 277, § 38.

one apparent. A rational jury could easily conclude that the weapon possessed by the defendant was designed primarily for stabbing.

Nor is the blade too long to be considered a dagger. While the blade in question was referred to by the witness and the Commonwealth as a "sword," this does not preclude it from being considered a "dagger" under the statute. There is not a bright line dividing longer daggers and shorter swords. See 3 Oxford English Dictionary 7 (1978) (defining dagger as "[a] short . . . weapon, like a small sword, used for thrusting and stabbing"); The Random House Dictionary of the English Language 364 (1973) (defining dagger as "a short, swordlike weapon"); State v. Leatherman, 100 Wash. App. 318, 323 (2000) (pointing out one of dictionary definitions of "dagger" also "a weapon resembling a short sword").[22] Our decision not to artificially create such a bright line is consistent with the legislative purpose, noted supra, of outlawing the possession of weapons primarily designed for stabbing human beings. The weapon in this case is not so long as to fall outside the realm of daggers. Thus, a rational jury could conclude that the weapon in question had all of the characteristics of a dagger.[23]

c. Improper jury instruction. The jury were improperly instructed on the elements of possession of a dangerous weapon where the weapon was not found on the defendant at the time of the arrest. The judge defined "dangerous weapon" in this instruction by referring to an earlier instruction in the context of the elements of mayhem. That earlier instruction, properly in that context, stated that the jury had to find that an item is "inherently dangerous because it can be readily used to cause death or great bodily harm" for it to qualify as a dangerous weapon for the purposes of mayhem. See Commonwealth v.

---

[22] It is furthermore worth noting, as we explained in Miller, "[a] dirk is a long straight bladed dagger or short sword," which indicates that certain long daggers and short swords are roughly equivalent. Miller, 22 Mass. App. Ct. at 696.

[23] Having reached this conclusion, we recognize that the common understanding of the weapons enumerated in G. L. c. 269, § 10(b), may not be as clear to people today as they were in the past. The Legislature may wish to examine the statute to state in more current terms what items are prohibited. See Commonwealth v. Wood, 398 Mass. 135, 137 n.3 (1986); DiGregorio v. Registrar of Motor Vehicles, 78 Mass. App. Ct. 775, 782 n.14 (2011).

*Farrell*, 322 Mass. 606, 614-615 (1948). The instruction was, however, not correct on the charge of possession of a dangerous weapon under G. L. c. 269, § 10(*b*), as it did not require the jury to determine whether the sword possessed by the defendant fell within one of the categories of weapons outlined in G. L. c. 269, § 10(*b*).

Because there was no objection to the jury instruction below, we review to determine whether the error created a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Belcher*, 446 Mass. 693, 696 (2006). Generally, there is not a substantial risk of a miscarriage of justice where an improper jury instruction concerned an element that the defendant did not contest at trial because he pursued a defense of misidentification. *Commonwealth* v. *Robinson*, 444 Mass. 102, 107 (2005), citing *Commonwealth* v. *Jenkins*, 47 Mass. App. Ct. 286, 292 (1999). Here, the defendant chose to pursue a defense based on misidentification and did not contest that the weapon in question was a dangerous weapon prohibited by G. L. c. 269, § 10(*b*). In these circumstances, given that there was sufficient evidence for the jury to find that the "pimp cane" described by the witness was a dangerous weapon under the statute, there was no substantial risk of a miscarriage of justice.

2. *Sufficiency of evidence of mayhem.* The defendant argues that there was insufficient evidence of the severity of the victim's wounds for a rational jury to convict him of the crime of mayhem. The crime of mayhem may be satisfied by a showing under one of two theories. *Commonwealth* v. *Ogden O.*, 448 Mass. 798, 800 (2007). The Commonwealth may prove the crime of mayhem under the second theory by showing that a person, "with intent to maim or disfigure, assaults another person with a dangerous weapon, substance or chemical, and by such assault disfigures, cripples or inflicts serious or permanent physical injury upon such person." *Ibid.*, quoting from G. L. c. 265, § 14. The victim in this case was described by an eyewitness as covered in blood with his intestines hanging out. In addition, he was in critical condition when he arrived at the Charlton Memorial Hospital, his wounds were described as "life threatening," and the doctor inferred that he had severe internal bleeding. There is no doubt that, under the standard of *Latimore*, 378 Mass. at 676-678, a

rational jury could find beyond a reasonable doubt that such wounds constituted "serious . . . physical injury." G. L. c. 265, § 14.

3. *Effective assistance of counsel.* The defendant argues that his trial counsel was constitutionally ineffective in failing to file a motion to suppress the defendant's telephone statements made while in pretrial detention. To succeed on a claim of ineffective assistance of counsel, a defendant must show (1) "serious incompetency, inefficiency, or inattention of counsel — behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer" and, if that is found, (2) that this ineffectiveness "likely deprived the defendant of an otherwise available, substantial ground of defence." *Commonwealth* v. *Dodgson*, 80 Mass. App. Ct. 307, 315 (2011), quoting from *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974).

In 2009, the Supreme Judicial Court held in *Commonwealth* v. *Odgren*, 455 Mass. 171, 172 (2009) (*Odgren*), that the Commonwealth may not subpoena the production of records from a third party in advance of a trial or an evidentiary hearing under the authority granted by G. L. c. 277, § 68, without first obtaining judicial approval pursuant to Mass.R.Crim.P. 17(a)(2), 378 Mass. 886 (1979), as construed by *Commonwealth* v. *Lampron*, 441 Mass. 265, 268-271 (2004). See Mass.G.Evid. § 1108 (2012). It is uncontested that the Commonwealth violated the rule in *Odgren* by not seeking judicial approval under Mass. R.Crim.P. 17(a)(2) for issuing a subpoena, in advance of trial, for the recordings of the defendant's telephone calls made during his pretrial detention.[24] However, the defendant's trial ended in October of 2006, three years prior to the *Odgren* decision. The practice overruled by *Odgren* was apparently commonly used before it was found to be unlawful. See *Odgren*, 455 Mass. at 173 n.5 (correction facility's telephone system administrator had received "thousands" of such subpoenas from various district

---

[24]In addition, the subpoena required Silva to produce the recordings at the final pretrial conference, rather than for either a hearing or trial as required by G. L. c. 277, § 68. See *Odgren*, 455 Mass. at 183 n.23. The subpoena also incorrectly requested that a copy of the records be sent directly to the district attorney's office, rather than the court. *Id.* at 184 n.24.

attorney's offices over ten-year period).[25] Thus, it is doubtful that the defense attorney's failure to move for suppression of the materials in this case was conduct falling "measurably below" that expected from an ordinary, fallible lawyer.

Even were that the case, the defendant has not shown a likelihood that such a motion would have succeeded. While *Odgren* did not preclude the possibility of suppression for an improperly issued subpoena, it found two reasons that suppression was not warranted in that case, both of which are applicable here. See *id.* at 187-188. Just as in *Odgren*, the defendant here has not shown a violation of a constitutional right that would warrant suppression. See *id.* at 188. In addition, the defendant here was provided copies of the subpoenaed recordings well before trial, much like in *Odgren*, and thus cannot show prejudice in his ability to prepare for trial that would warrant suppression. See *ibid.*[26] The defendant was thus not likely deprived of a substantial ground of defense by any misstep his lawyer may have made.

4. *Missing witness instruction.* The defendant alleges that the judge's decision not to give a missing witness instruction due to the victim's failure to testify was manifestly unreasonable. "The decision whether to provide a missing witness instruction to the jury is within the discretion of the trial judge, and will not be reversed unless the decision was manifestly unreasonable." *Commonwealth* v. *Saletino*, 449 Mass. 657, 667 (2007).[27] For a missing witness instruction to be appropriate, a party who

---

[25]A similar misunderstanding of the proper use of subpoenas was noted by at least one Federal court under the directly analogous Fed.R.Crim.P. 17(c). *Odgren*, 455 Mass. at 187 n.27, citing United States *vs.* Eye, U.S. Dist. Ct., No. 05-00344-01-CR-W-ODS (W.D. Mo. April 15, 2008).

[26]The defendant argues that the inculpatory nature of the evidence warrants suppression, but "[t]he relevant prejudice is whether the defendant receives the material sufficiently before trial to prepare a defense, not whether the admissible evidence is inculpatory." *Commonwealth* v. *Kastner*, 76 Mass. App. Ct. 131, 137 n.10 (2010). The defendant argues that we should look at the degree to which the evidence is inculpatory because the Commonwealth could not have obtained judicial approval for the subpoena. Even if this were the law, the defendant has not shown that the Commonwealth could not obtain judicial approval under the liberal standards of *Commonwealth* v. *Lampron*, 441 Mass. at 268-271. In addition, the Commonwealth correctly points out that even if it did not meet the *Lampron* standard, it could have obtained the evidence by requiring Silva to bring the materials to trial under G. L. c. 277, § 68.

[27]The degree of discretion is reduced but not eliminated where, as here, the

has failed to call a witness must "ha[ve] knowledge of a person who can be located and brought forward, who is friendly to, or at least not hostilely disposed toward, the party, and who can be expected to give testimony of distinct importance to the case." *Id.* at 667-668, quoting from *Commonwealth* v. *Anderson*, 411 Mass. 279, 280 n.1 (1991). *Commonwealth* v. *Figueroa*, 413 Mass. 193, 199 (1992). See Mass.G.Evid. § 1111 (2012). The prosecutor indicated that the Commonwealth had made "every effort" to locate the victim but was unable to do so. The defendant has not shown the trial judge's acceptance of this claim to be manifestly unreasonable. The judge thus properly determined that the victim could not be located and that a missing witness instruction would have been improper.

*Conclusion.* There was sufficient evidence for a rational jury to find that the weapon possessed by the defendant fell within the definition of a "dagger" under G. L. c. 269, § 10(*b*). While the jury instructions regarding what constitutes a dangerous weapon for the crime of possession of a dangerous weapon where the weapon was not found on the defendant's person at the time of arrest were clearly erroneous, we find no substantial risk of a miscarriage of justice given the defendant's failure to contest the issue. None of the defendant's remaining contentions has merit. The defendant's convictions and the denial of the defendant's motion for a new trial are affirmed.

*Judgments affirmed.*

*Order denying motion for
new trial affirmed.*

---

requested missing witness instruction would be adverse to the Commonwealth. *Ibid.*, citing *Commonwealth* v. *Smith*, 49 Mass. App. Ct. 827, 831-832 (2000).